# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **RONALD ANTHONY AZZANNI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:09cv0260 TCM** |
| | ) | |
| **METLIFE DISABILITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court[1] on the opposed motion of defendant, MetLife Disability ("MetLife") for summary judgment. [Doc. 30] At issue is whether plaintiff, Ronald Anthony Azzanni, is entitled to additional long-term disability benefits under a Plan sponsored by his former employer, the IBM Corporation ("IBM"), and governed by the Employee Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. § 1001-1461.

## Background

Plaintiff was hired for a sedentary job by IBM before 1995[2] and was a participant in IBM's Long-Term Disability Plan for Employees Hired Prior to 01/01/2004 ("the Plan"). (Admin. R. at 77; Def. Stip.[3] ¶ 1.) The Plan, issued by MetLife and governed by ERISA, defines "disabled" as follows.

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2]The parties' dispute about whether Plaintiff was hired in 1993 or 1994 is immaterial to the relevant issues.

[3]"Stip." refers to a party's statement of uncontroverted material facts that are either admitted by the opposing party or are established by the evidence.

"[D]isabled" means that during the first 12 months after you complete the elimination period, you cannot perform the important duties of your regular occupation with IBM because of a sickness or injury. After expiration of that 12 month period, disabled means that, because of sickness or injury, you cannot perform the important duties of any other gainful occupation for which you are reasonably fit by your education, training or experience. You must be under the appropriate care of a doctor on a continuing basis. At your own expense, proof of disability, satisfactory to Metropolitan, must be submitted to Metropolitan. "Your regular occupation with IBM" means the regular occupation you had with IBM as of the last day of active status.

(Id. ¶¶ 5, 6.)

The Plan includes the following, relevant limitations.

If you are disabled due to one or more of the conditions listed below, your disability benefits will be limited to a lifetime maximum equal to the lesser of:

**24 months; or**

**The maximum Disability Benefit Period**

Your disability benefits will be limited as stated above for the following conditions:

**Mental or Nervous Disorder or Disease except for**:

schizophrenia;

dementia; or

organic brain disease.

Mental or Nervous Disorder or Disease means a medical condition which meets the diagnostic criteria set forth in the most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders* as of the date your disability begins. A condition may be classified as a Mental or Nervous Disorder or Disease regardless of its cause.

(Id. ¶ 7.)

The Plan expressly grants MetLife, its named fiduciary, discretionary authority to interpret the terms of the Plan. (Admin. R. at 335-36.) Specifically,

> [i]n carrying out their respective responsibilities under the LTD [Long-Term Disability] Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the LTD Plan and to determine eligibility for and entitlement to LTD Plan benefits in accordance with the terms of the LTD Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(Id. at 336.)

Plaintiff stopped work in June 2006 and submitted thereafter a timely claim for benefits under the Plan, reporting that he was unable to perform his job duties on a regular basis due to problems concentrating and staying awake, back pain, and carpal tunnel syndrome. (Id. at 75, 284) IBM submitted that portion of the application for LTD to be completed by the employer and identified Dr. Robert H. Rifkin, M.D., as the site area physician who might have information on Plaintiff. (Id. at 301-03.) The office notes of Dr. Rifkin, a psychiatrist, dated August 8, 2006; September 19, 2006; and October 31, 2006, include his opinion that Plaintiff was disabled and not able to return to work. (Id. at 291-93; Def. Stip. ¶ 10.) Also before MetLife were records from Gerald M. Tullman, Ph.D., a psychologist who had seen Plaintiff on July 13, 2006, and July 20, 2006. (Admin. R. at 285-90.)

During a telephone interview on November 29, 2006, with a MetLife representative, Plaintiff stated that his endocrinologist, Norman Fishman, M.D., had recommended that he stay off work for one week because of the difficulty in controlling his diabetes, a difficulty Dr. Fishman thought might be attributable to Plaintiff's depression. (Def. Stip. ¶ 12; Admin.

R. at 6.)  His diabetes worsened; consequently, Dr. Fishman referred Plaintiff to a psychiatrist.  (Def. Stip. ¶ 12.)  Also, Plaintiff reported that he was having difficulties concentrating at work, keeping up with his duties, and sleeping at night.  (Id.)

The same day as the interview, MetLife was informed by Dr. Rifkin's office that Plaintiff's condition was unchanged.  (Id. ¶ 13.)  Two days later, MetLife determined that the medical documentation supported Plaintiff's psychiatric disorder and, on December 5, approved Plaintiff's disability claim based on that disorder.  (Id. ¶¶ 14, 15.)  On December 15, MetLife determined that additional records submitted from Drs. Fishman and Rifkin did not affect its decision.  (Id. ¶ 16.)

Five months later, in May 2007, Dr. Rifkin completed MetLife's Defendant's psychiatric questionnaire.  (Admin. R. at 240-41.)  He diagnosed Plaintiff with major depressive disorder, recurrent, moderate,[4] and listed his current Global Assessment of Functioning[5] as 50[6] and the highest in the past year as 85.[7]  (Id. at 240.)  He reported that Plaintiff was taking 200 mg of Zoloft, an antidepressant, per day.  (Id.)  Plaintiff slept

---

[4]Dr. Rifkin did not list the name of the disorder, but listed the code, 296.32, for major depressive disorder, recurrent, moderate.  See AllPsych Online The Virtual Psychology Classroom, http://allpsych.com/disorders/disorders_alpha.html (last visited March 29, 2010).

[5]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008).

[6]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Diagnostic Manual at 34.

[7]A GAF between 81 and 90 indicates "[a]bsent or minimal symptoms . . . good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns . . . ."  Diagnostic Manual at 34.

excessively, could not concentrate or make decisions, was overwhelmed by small things, had a flat affect, and was not completing his responsibilities, such as taxes and bills.  (Id.)  Plaintiff appeared "chronically and permanently and totally disabled."  (Id. at 241.)  Dr. Rifkin had first treated Plaintiff on July 24, 2006, and had seen him monthly since.  (Id.)

Dr. Rifkin also submitted his office notes of January 23, 2007, March 6, and May 1.  (Admin. R. at 242-44.)  The January notes report Plaintiff had purchased a new used car, a 2006 Camry, was applying for social security, and was training his new dog and taking her to the dog park, but Plaintiff was having trouble paying his bills and living on $800 per month.  (Id. at 244.)  The March records note Plaintiff's report that he did not have any energy and was caring for his dog, but not cleaning his house.  (Id. at 243.)  He belonged to the Greater St. Louis Rose Society, attended their meetings, and was looking forward to nice weather, gardening, and showing his dog.  (Id.)  He had no suicidal thoughts, did not feel hopeless, and had no crying spells.  (Id.)  He did have difficulty concentrating and getting motivated to get things done.  (Id.)  The May records note that Plaintiff had again applied for social security, enjoyed his dog, and "was more laid back, not as upset about things, loves life."  (Id. at 242.)  He had learned not to be bothered by sister, had sold his Jeep to his niece for $3000, and had enjoyed a trip to Florida in April.  (Id.)

The submitted records of Dr. Fishman include an "Attending Physician Statement" of May 22, 2007.  (Id. at 235-36.)  This report named a primary diagnosis of diabetic retinopathy, and a secondary diagnosis of depression/anxiety.  (Id. at 235.)  Plaintiff's "subjective symptoms" were "diabetes in poor control" and "rapid swings in sugar."  (Id.)  His treatment plan included (a) insulin management and (b) psychiatric treatment with Dr.

Rifkin and use of Zoloft. (Id.) Under the "Psychological Function" section of the form, Dr. Fishman marked the box for "Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)." (Id. at 236.) Under the "Physical Capabilities" section, Dr. Fishman circled the "0" for how long Plaintiff could sit, stand, or walk. (Id.) Plaintiff also could not climb, twist/bend/stoop, reach above shoulder level, or operate a motor vehicle. (Id.) Plaintiff was unable to lift any weight or perform fine finger movements, eye/hand movements, and pushing/pulling. (Id.) Dr. Fishman opined that Plaintiff was unable to perform job duties because his diabetes was labile, he could not work any hours, and he was not expected to improve. (Id.) He advised Plaintiff not to return to work and to work on his diabetes. (Id.)

MetLife approved Plaintiff's LTD claim on the basis of the diagnosis of major depression. (Stip. ¶ 20.) In June 2007, MetLife informed Plaintiff that his continued LTD benefits were approved and that it would periodically request proof of his continuing total disability. (Stip. ¶ 21.)

In August 2007, Dr. Fishman completed another "Attending Physician Statement." (Id. ¶ 22.) This statement was essentially identical to his previous one. (Id.)

In January 2008, Dr. Rifkin completed another MetLife psychiatric questionnaire on behalf of Plaintiff. (Admin. R. at 202-03.) He reported on this questionnaire that Plaintiff's depression affected his daily living activities in that he escaped by sleeping excessively, had difficulty concentrating and making decisions, was overwhelmed by little things, was anergic (had no energy) and irritable, had a flat affect, and had "a paucity of thinking." (Id. at 202.) Asked which symptoms, deficits, or functional impairments that Plaintiff displayed that

interfered with him performing work related activities, Dr. Rifkin repeated the answer he had given in May 2007. (Id. at 202, 241.) He also repeated his earlier conclusion that Plaintiff appeared to be chronically and permanently and totally disabled and his earlier GAF findings. (Id. at 202, 203, 240, 241.)

The next month, Dr. Fishman completed another Statement essentially identical to his two previous ones. (Stip. ¶ 24.)

On February 27, 2008, MetLife noted that the limited benefit period for a mental disorder would end for Plaintiff on December 4, 2008. (Stip. ¶ 25.) MetLife further noted that the medical records listed a diagnosis of Type II insulin-dependent diabetes and diabetic retinopathy, but the exam findings reported Plaintiff as normal. (Id.) There were no ophthalmology notes available for review and no exam findings to support Plaintiff's endocrinologist's opinion on Plaintiff's restrictions and limitations. (Id.) MetLife concluded that the medical records did not support a non-psychological disability diagnosis and determined that it would obtain Plaintiff's updated medical records. (Id.)

Subsequently, MetLife obtained the records of Nicholas E. Engelbrecht, M.D., with the Barnes Retina Institute. (Id. ¶ 26.) When Dr. Engelbrecht examined Plaintiff in October 2006, his visual acuity was 20/30-1 in each eye. (Id. ¶ 27.) In May 2007, Plaintiff's visual acuity was 20/25 in the right eye and 20/20 in the left. (Id.) That same month, Dr. Engelbrecht wrote to Dr. Fishman that Plaintiff showed no evidence of macular edema or neovascularization in either eye. (Id. ¶ 27; Admin. R. at 141.) He opined that Plaintiff had "mild nonproliferative diabetic retinopathy in both eyes" and that this condition appeared stable." (Id.) He discussed with Plaintiff the importance of blood sugar control,

recommended observation, and asked him to follow-up annually, or as needed for additional visual changes. (Id.) One year later, in May 2008, Plaintiff's visual acuity was 20/40 in each eye; his vision was stable. (Stip. ¶ 28.)

Dr. Rifkin's August 2008 questionnaire answers were similar to those previously given, including his GAF findings. (Id. ¶ 29.) His office records, dated April, June, and August of 2008, included notations that Plaintiff was caring for his dogs, one of which was in heat and another was entered in a show; had filed his income tax return; enjoyed cooking and doing new things; had traveled to Wichita with the daylily society; had been on a cruise – had a cabin with a balcony – to Hawaii and had toured Pearl Harbor; and was having back problems. (Admin. R. at 162-64.) His dosage of Zoloft was 100 mg – half his previous dosage. (Id.)

In September 2008, MetLife submitted Plaintiff's medical records to a MetLife nurse consultant for review. (Stip. ¶ 31.) The nurse consultant reported as follows.

> Medical received does not indicate need for change in primary diagnosis. There is no indication that vision deteriorated to a level that would impact functionality. EE [employee] relates participation in dog shows/breeding activities and Day Lily Society events. Last OVN[8] indicates stable vision and EE is to return for recheck in one year. Records from endocrinology indicate motoring of diabetes. No labs are submitted, there is no indication for need/attention to renal cyst or gallstones. There is no indication that diagnostic testing or additional medical review is needed at this time. Medical evaluation by Dr. Fishman notes physical exam within normal limits. Medical submitted does not support functional impairment due to physical findings or medical diagnoses of non-psychiatric nature. Recommend continue review by PCS [psychiatric clinical specialist] for LDB [limited disability benefit]. There is no indication for a need to change diagnoses nor is there support for additional medical impairment.

---

[8]There is no explanation in the record of what "OVN" stands for.

(Stip. ¶ 31; Admin. R. at 49.) (Alterations in original.)

The next month, MetLife again advised Plaintiff that its limited, twenty-four month benefit period for a disability caused by a mental or nervous disorder would end in his case on December 4, 2008.  (Admin. R. at 148-49.)

Two weeks later, Dr. Rifkin wrote MetLife that Plaintiff had significant problems with depression and hypersomnia, resulting in an inability to work due to impaired attention span, extreme lack of energy, and a "tendency toward escaping through sleep."  (Id. at 146.) Dr. Rifkin opined that Plaintiff is totally and permanently disabled because of his depression. (Id.)

At MetLife's request, Dr. Fishman submitted another "Attending Physician Statement."  (Id. at 128-29.)  His primary diagnosis was diabetes mellitus and diabetic retinopathy; his secondary diagnosis was depression/anxiety.  (Id. at 128.)  Plaintiff's exertional limitations were unchanged.  (Id. at 129.)  There was no evidence of any improvement, and Plaintiff still needed to work on his diabetes.  (Id.)

In November 2008, MetLife's nurse consultant reviewed the medical records relevant to Plaintiff's diabetes.  (Id. at 53.)  This consultant noted the normal findings of Plaintiff's October 2008 examination and concluded that they did not evidence any physical disability that would prevent Plaintiff from performing a sedentary job.  (Id.)

MetLife again wrote Plaintiff about the Plan's limited LTD benefits for a mental or nervous disorder, advising him, in part, as follows.

> Our records show your disability is due to a mental and nervous diagnosis which is one of these limited conditions.  The plan limit for benefits due to this type of limited condition is 24 months.  Therefore, we are notifying you that

the maximum duration for this limited condition will be reached on December 4, 2008.

. . .

Medical documentation received indicates you are seen by your ophthalmologist every 2 years and have not received an invasive treatment for retinopathy. Your recent exam findings from October 7, 2008 are within normal limits.

The additional medical documentation reviewed does not support a physically disabling condition that would prevent you from performing the essential functions of a sedentary demand job. Therefore, your Long Term Disability Benefits will terminate on December 4, 2008.

To consider benefits after December 5, 2008 you should submit the following information regarding your other medical condition(s): office notes, limitations/restrictions, and diagnostic testing results as evidence of continued disability due to a non-limited medical condition.

(Id. at 121-22.)

Plaintiff was also advised of his right to appeal the adverse decision. (Id. at 122.) He did so, but submitted no additional records. (Stip. ¶ 38.)

Pursuant to his appeal, Plaintiff's claim file was reviewed by Derrick Bailey, M.D., Board certified in internal medicine, and by Salvador M. Guinjoan, M.D., Ph.D., Board certified in psychiatry. (Id. at 100-04, 107-11.)

Dr. Bailey's report reads, in part.

The claimant has diabetic retinopathy but it is nonproliferative, mild, stable and he has good visual acuity. He has not required any photocoagulation of the retina because of his diabetic disease. There is no record of diabetic neuropathy or nephropathy. The claimant's record does not show much in terms of secondary effects or complications from diabetes, outside of the control which could be better. Because of sub optimal control of diabetes the claimant is limited to light physical activity. My assessment is that the blood sugar profile is not supportive of inability to do any physical work whatsoever.

The record does not show the claimant needing hospitalization or in-hospital treatment because of abnormalities in blood sugar or complications from diabetes.

There is no evidence of secondary effects from hypertension or symptoms from elevated hypertension causing limitation of function and abilities. There is no evidence of any functional impairment from hypercholesterolemia. There is no evidence of heart disease that is of impairing severity.

There is mention of the claimant sleeping a lot and having hypersomnia but the evidence for this is mostly on subjective self report. There is no sleep study in file. There is no assessment of daytime sleepiness such as an Epworth Sleepiness Scale or a Multiple Sleep Latency Test. The evidence in file does not at this time support functional limitations on the basis of hypersomnia.

. . .

No limitations found to doing work of light were [sic] sedentary level. However because of diabetic control which is not as good as it should be, more strenuous activity is limited.

(Id. at 100-01.)

At the end of his report, Dr. Bailey included the following notation about a call he had

received from Dr. Fishman.

Dr. Fishman called me back today [January 9, 2009] concerning the claimant. He said the claimant was unable to function because of anxiety and depression anxiety and depression [sic] which affected the control of his diabetes. He said the claimant's diabetes is poorly controlled. He said the claimant's blood sugars have recently been higher in the 200 to 400 range. He says he can't see the claimant focusing enough to be able to work. I asked about the report of hypoglycemic episodes and Dr. Fishman said the claimant's blood sugars were no [sic] running much higher recently than they had been before. He faxed to me a printout of the claimant's blood sugars in October and November. The majority of the blood sugars in October are in the 100 range. There were two low blood sugars of 59 and 62. There were about 5 blood sugars in the 200 range. There was another area of the printout that was harder to read and appear to have blood sugars up to 300 and 400 range. It is noted however that all of these blood sugars were done using a friend's meter and not the claimant's meter which he said had dropped on the street and got run over. It is therefore not clear whether these readings are as accurate as the prior

readings. There two other sheets with blood sugar readings. The lowest reading I saw on these was 63 on 10/8. Again the majority of the readings were in the 100 range. There was one reading in the 400 range and two in the 300 range.

(Id. at 104.)

Dr. Guinjoan's report reads, in relevant part, as follows.

I called Dr. Rifkin . . . as previously arranged for a teleconference.

. . .

He stated the patient was chronically depressed, and his feeling was that he was not able to perform his job. He was not able to concentrate, focus, stay on tasks, and he was isolative and withdrawn. Of note, the patient had not been formally tested in support of any of these referred cognitive problems. These are all self reported. He stated that patient was able to pay his bills. He was also able to maintain his functioning at home. Dr. Rifkin confirms that the patient was not, and had never been psychotic. He also had no evidence of cognitive disorders. His medications as of the time we talked were Zoloft 150 mg. per day and apparently, the patient also was taking 100 mg. of trazodone.

. . .

Dr. Rifkin stated that the patient had been disabled going on three years, and he felt that the patient could not return to work. . . . The patient was not and had never been suicidal per Dr. Rifkin's input. The patient was not on psychotherapy. . . .

[A]ccording to the reviewed medical records and my interaction over the phone with Dr. Rifkin, [Plaintiff's] diagnosis is major depressive disorder, mild. . . .

Progression of symptoms seems to have been toward significant improvement. Dr. Rifkin explained [Plaintiff] suffers from chronic depression, but the course of it seems to have been relatively benign without strong evidence of incapacitating severity, . . .

As examples of the lack of evidence of severity, Dr. Guinjoan cited Dr. Rifkin's January 2007 description of Plaintiff as "notes having been doing ok"; the March 2007 report by

Plaintiff that he was "doing pretty good," had no suicidal thoughts, and was not hopeless; the May 2007 report that Plaintiff "feels more laid back," was "[n]ot as upset about things." "[l]oves life," enjoyed his dog, and gardening"; and a four-month gap in appointments because Plaintiff drove "a lot" visiting friends. (Id. at 108.) Dr. Guinjoan also noted Dr. Rifkin's report of Plaintiff's trip in January 2008 to Chicago to have a dog mated and remarked on the detailed description given by Plaintiff to Dr. Rifkin of the mating process, the potential value of any puppies, and his involvement in the sale of those puppies. (Id. at 108-09.) Notes of Plaintiff's August 2008 session with Dr. Rifkin evidenced "a significant deal of traveling to pet shows and possibly gardening." (Id. at 109.) Although when answering the MetLife questionnaire, Dr. Rifkin described Plaintiff as having a "'severely impaired attention span, extreme anergy as well as a tendency towards escaping through sleep,'" Dr. Guinjoan opined that Plaintiff had "fairly intact executive functions, indicated by his extensive traveling and activities related to his pet" which were not accounted for in Dr. Rifkin's description. (Id.) "Further a few days prior, on 10/07/08, Dr. Fishman (diabetes and endocrinology specialist) documented full orientation, normal memory, and normal mood and affect." (Id.)

Responding to a specific question, Dr. Guinjoan reported that Plaintiff did not have any ongoing, psychiatric functional limitations after December 5, 2008. (Id.) He explained that there was "no description of measurable cognitive dysfunction in the medical records," nor was it deemed necessary at any time for Plaintiff's cognitive status to be tested. (Id. at 110.) Plaintiff's treatment course, "i.e. followup less than once a month, and maintenance on the same antidepressant for the last two and half years," indicated "a stable" and

"relatively benign mood condition."  (Id.)  Plaintiff was never noted "to have any symptoms indicative of schizophrenia, dementia, or organic brain disease."  (Id. at 111.)

MetLife faxed Drs. Bailey's and Guinjoan's reports to Drs. Rifkin, Fishman, and Engelbrecht for review and comment.  (Stip. ¶ 45.)  Dr. Rifkin responded that he had reviewed the report and had no further reports.  (Id. ¶ 46.)  Drs. Fishman and Engelbrecht did not respond.  (Id.)

MetLife then upheld the termination of Plaintiff's LTD benefits, explaining as follows.

> In conclusion, the available medical documentation fails to support a functional impairment or restriction which would preclude you from performing from a light level occupation or lower as of December 5, 2008. Your job with IBM was noted to be sedentary.  Further, there is no indication you have been diagnosed with an exclusionary psychiatric diagnosis under the Plan.  Therefore, on appeal review, we find you failed to satisfy the Plan's definition of Disability and the previous decision to terminate LTD benefits for the time period in question is appropriate and remains in effect.

(Id. ¶ 47.)

This action followed.

## Discussion

"'Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" **Loeb v. Best Buy Co.**, 537 F.3d 867, 871 (8th Cir. 2008) (quoting Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007)). When making this determination, the Court views the evidence, and any reasonable inferences therefrom, in the light most favorable to the nonmovant, Plaintiff. **Id.** In opposing a properly-supported motion for summary judgment, Plaintiff may not "merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor." **Bass v. SBC Commc'ns, Inc.**, 418 F.3d 870, 872-73 (8th Cir. 2005). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" **Id.** (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). And, "[w]here, as here, the unresolved issues are primarily legal, rather than factual, summary judgment is particularly appropriate." **Jankovitz v. Des Moines Indep. Comty. School Dist.**, 421 F.3d 649, 653 (8th Cir. 2005).

"ERISA . . . is a comprehensive statue that sets certain uniform standards and requirements for employee benefit plans," **Minnesota Chapter of Associated Builders and Contractors, Inc. v. Minnesota Dep't of Public Safety**, 267 F.3d 807, 810 (8th Cir. 2001) (interim quotations omitted), and was enacted to prevent "the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from [those] funds, " **Massachusetts v. Morash,** 490 U.S. 107, 115 (1989).

In ERISA cases, the Court conducts a de novo review of the denial of benefits "*unless a plan administrator has discretionary power to construe uncertain terms or to make eligibility determinations, when review is for abuse of discretion.*" **Rittenhouse v. UnitedHealth Long Term Disability Ins. Plan**, 476 F.3d 626, 628 (8th Cir. 2007). The policy or other plan documents must include explicit language granting this discretionary power to trigger a deferential standard of review. **McKeehan v. Cigna Life Ins. Co.**, 344 F.3d 789, 793 (8th Cir. 2003). Accord **McGarrah v. Hartford Life Ins. Co.**, 234 F.3d 1026, 1030 (8th Cir. 2000) ("In general, the abuse -of-discretion standard applies if . . . the plan expressly gives the administrator discretion to determine eligibility for benefits and to construe the terms of the plan."). Under the abuse-of-discretion standard, the plan administrator's decision is reversed "'only if it is arbitrary and capricious.'" **Groves v. Metro. Life Ins. Co.**, 438 F.3d 872, 874 (8th Cir. 2006) (quoting Hebert v. SBC Pension Benefit Plan, 354 F.3d 796, 799 (8th Cir. 2004)).

As noted above, the Plan expressly grants MetLife discretionary authority to interpret the terms of the LTD provisions and to determine eligibility for and entitlement to benefits. (See Admin. R. at 336, § 3.4.27.) This discretionary power is sufficient to trigger the abuse-of-discretion, arbitrary and capricious standard of review.

"To determine whether a plan administrator's decision was arbitrary and capricious, [the Court] ask[s] whether the decision to deny . . . benefits was supported by substantial evidence, meaning more than a scintilla but less than a preponderance.'" **Midgett v. Washington Group Int'l Long Term Disability Plan**, 561 F.3d 887, 897 (8th Cir. 2009) (quoting Schatz v. Mutual of Omaha Ins. Co., 220 F.3d 944, 949 (8th Cir. 2000)) (third

alteration in original).  If the administrator's decision "'is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made.'"  **Id.** (quoting Schatz, 220 F.3d at 949).  Thus, "[a] plan administrator's decision must be upheld 'if a reasonable person *could* have reached a similar decision, given the evidence before him,  not that a reasonable person *would* have reached that decision.'"  **West v. Local 710, Int'l Brotherhood of Teamsters Pension Plan**, 528 F.3d 1082, 1085 (8th Cir. 2008) (quoting Administrative Committee of the Wal-Mart Stores, Inc. v. Gamboa, 479 F.3d 538, 542 (8th Cir. 2007)).  Moreover, when a plan administrator's decision is supported by relevant evidence that a reasonable mind might accept as adequate to support a decision, the Court may not substitute its own judgment for the administrator's.  See **Jackson v. Prudential Ins. Co. of America**, 530 F.3d 696, 701 (8th Cir. 2008).

In the instant case, Plaintiff does not contest the termination of his LTD on the basis of the Plan's twenty-four month limitation for disability benefits due to a mental or nervous disorder.  Rather, he challenges MetLife's decision to deny him LTD benefits based on his physical disability, diabetes.  The question is whether this decision is an abuse of discretion.

After reviewing medical information and opinions from Plaintiff's endocrinologist, Dr. Fishman; Plaintiff's psychiatrist, Dr. Rifkin; and Plaintiff's psychologist, Dr. Tullman, and after a telephone interview with Plaintiff, MetLife determined that the record supported a psychiatric disorder and, on December 5, 2006, approved Plaintiff's claim for disability based on that disorder.  Dr Fishman referred Plaintiff to a psychiatrist because he believed Plaintiff's diabetic issues were related to Plaintiff's depression.  Dr. Fishman's four "Attending Physician Statements" reported that Plaintiff could not (a) engage in interpersonal

relations, (b) operate a motor vehicle, (c) lift any weight at all, (d) perform any eye/hand or fine finger movements, (e) sit, stand or walk for any an hour, and (f) return to work because of his diabetes. Dr. Fishman consistently reported that there was no evidence of improvement in any area.

During this same time period, however, Dr. Rifkin reported that Plaintiff had purchased a car, enjoyed training a new dog, was showing a dog, was caring for his dogs, enjoyed belonging to flower societies, looked forward to the spring gardening weather, took trips related to his dogs or his gardening interests, and took a cruise to Hawaii. These activities are inconsistent with Dr. Fishman's report. Indeed, Dr. Rifkin's own opinion that Plaintiff was totally, permanently, and chronically disabled by a mental disorder is inconsistent with these activities.

MetLife, in February 2008, noted that Plaintiff's benefit period for a mental disability would end on December 4, 2008, and also noted his diagnosis of Type II insulin-dependent diabetes and diabetic retinopathy. MetLife then noted that Plaintiff's exam findings were normal and did not support the endocrinologist's opinion and that there were no ophthalmology notes to review. Consequently, MetLife obtained Dr. Engelbrecht's records for the period from October 6, 2006 through May 27, 2008. Dr. Engelbrecht's report of May 25, 2007, states that Plaintiff has *mild* nonproliferative diabetic retinopathy in both eyes and that this condition is stable. He recommended only annual check-ups. At his next office visit, in May 2008, Plaintiff had visual acuity of 20/40 in each eye, and his vision was stable. Again, these findings are inconsistent with Dr. Fishman's report of total disability due to Plaintiff's diabetic retinopathy.

In November 2008, a MetLife nurse consultant reviewed Plaintiff's medical records of his diabetes and concluded that the record did not support a finding of a physical disability. The report of Dr. Bailey is consistent with the nurse consultant's opinion. Both these opinions are inconsistent with Dr. Fishman's opinions.

In summary, the termination of Plaintiff's LTD benefits based on a mental disorder is supported by the Plan's language limiting such benefits to a twenty-four month period and the declination of LTD benefits based on Plaintiff's diabetes and diabetic retinopathy is supported by the medical records. This second decision is supported by the opinions of consulting physicians and health care providers. Although Dr. Fishman concluded that Plaintiff was disabled by his diabetes, "treating physicians are not automatically entitled to special weight in disability determinations under ERISA." **Midgett**, 561 F.3d at 897 (citing Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003)). Moreover, consulting specialist opinions are sufficient to deny benefits when those opinions conflict with the treating physicians opinions, "'unless the record does not support the denial.'" **Id.** (citing Dillard's Inc. v. Liberty Life Assurance Co. of Boston, 456 F.3d 894, 899-900 (8th Cir. 2006)). In the instant case, as discussed above, the record does support the denial.

Plaintiff disagrees, arguing that Dr. Bailey's report did not address Dr. Fishman's physical disability determination. However, the Court may not impose on a plan administrator "a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." **Nord**, 538 U.S. at 834.

Plaintiff's reliance on **House v. Paul Revere Life Ins. Co.**, 241 F.3d 1045 (8th Cir. 2001), is misplaced. There, the court found that the plan administrator "possessed not even

a scintilla of evidence refuting the extensive documentation of [the plaintiff's] severe heart disease supplied by the specialist who had treated [the plaintiff] for a decade." **Id**. at 1048. There is no extensive documentation supporting Plaintiff's claim of disabling diabetes and diabetic retinopathy; and, there is more than a scintilla of evidence refuting the supporting documentation that was submitted to MetLife. Additionally, the medical evidence produced by Plaintiff's treating physician is inconsistent and is subject to MetLife's reasonable interpretation. There is also the opinions of consulting experts that are consistent with reasonable evidence of Plaintiff's lack of a physical disability. Also, the plan language in **House** only allowed the administrator the right to investigate a submitted claim by requiring a medical exam. **Id.** The Plan at issue requires Plaintiff to provide proof of disability satisfactory to MetLife. (See Admin. R. at 326-27.) He did not. Rather, the medical records, including Plaintiff's physician's own reports, and consultants's reports clearly contain support for MetLife's denial of LTD benefits based on a physical disability. "Where there is a conflict of opinion between a claimant's treating physician and the plan administrator's reviewing physicians, the plan administrator has discretion to find that the employee is not disabled unless 'the administrative decision lacks support in the record, or . . . the evidence in support of the decision does not ring true and is . . . overwhelmed by contrary evidence.'" **Cocker v. Metro. Life Ins. Co.**, 281 F.3d 793, 799 (8th Cir. 2002) (quoting Donaho v. FMC Corp., 74 F.3d 894, 901 (8th Cir. 1996)). Again, it is clear that evidence supporting MetLife's adverse decision does ring true and is not overwhelmed by contrary evidence. See **Id.** ("This is not a case where the plan administrator's decision is overwhelmed by contrary evidence.") (internal quotations omitted).

## Conclusion

Because MetLife's decision terminating Plaintiff's LTD benefits originally awarded based on a mental disorder and not extended based on a physical disorder is not an abuse of discretion,[9]

**IT IS HEREBY ORDERED** that the motion of MetLife Disability for summary judgment is **GRANTED**.  [Doc. 30]

An appropriate Judgment shall accompany this Memorandum and Order.


/s/Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  30th  day of March, 2010.

---

[9]The Court thanks appointed counsel for his excellent representation of Plaintiff.  Counsel is referred to Rule 12.07(B) of the Local Rules for the Eastern District of Missouri.